In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2676

JOSEPH FINCH, DAVID E. HENSLEY,
and PETER W. MUNGOVAN,

*Plaintiffs-Appellees,*

*v.*

BART PETERSON, individually and
in his official capacity, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-0432-DML-RLY—**Debra McVicker Lynch**, *Magistrate Judge.*

ARGUED DECEMBER 9, 2009—DECIDED SEPTEMBER 10, 2010

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This interlocutory appeal arises from a complaint filed against the City of Indianapolis, its law-enforcement Merit Board, and seven city officials alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. The plaintiffs—three white police lieutenants—claim they were subjected to reverse discrimination because they were passed over for promotion to the rank of captain despite

ranking higher on the Police Department's promotion eligibility list than three African-American lieutenants who were promoted ahead of them. The individual city officials moved for judgment on the pleadings, claiming qualified immunity based on the terms of a 1978 consent decree entered into by the Indianapolis Police Department and the United States Department of Justice ("DOJ"). They maintained that the consent decree required them to make the promotions at issue here. A magistrate judge disagreed and denied the motion, and the city officials appealed.

We affirm. The 1978 consent decree does not operate to confer qualified immunity on the city officials who were involved in making the challenged promotions. Nothing in that decree required them to take race into consideration in making promotions. To the contrary, specific language in the decree required promotions within the Police Department to be made without regard to race or color.

## I. Background

In December 2006 the Indianapolis Police Department[1] promoted 11 of its lieutenants to the merit rank of cap-

---

[1] On January 1, 2007, the Indianapolis Police Department was consolidated with the law-enforcement division of the Marion County Sheriff's Department to form the Indianapolis Metropolitan Police Department. For purposes of this opinion, "Police Department" refers both to the current Indianapolis Metropolitan Police Department and the previous Indianapolis Police Department.

tain. In making these promotions, the Police Department relied on a competitive process whereby applicants for promotion were screened, graded on the basis of a promotions exam, and then ranked on an "eligibility list." The top seven lieutenants on the eligibility list all received promotions to captain. Lieutenants David Hensley, Joseph Finch, and Peter Mungovan occupied the next three spots on the eligibility list (numbers 8-10), yet none of these men were promoted. Instead, three African-American lieutenants who ranked 12th, 17th, and 26th on the eligibility list were promoted ahead of them.[2]

After receiving a Notice of Right to Sue, the three lieutenants brought this suit alleging that the City of Indianapolis and its law-enforcement Merit Board violated Title VII, and that seven individual city officials who were involved in making these employment decisions violated § 1981 and § 1983 by denying them a promotion to captain solely on the basis of their race.[3] The defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure based

---

[2] The complaint is silent as to who received the eleventh promotion.

[3] The seven individual defendants are: Bart Peterson, the former mayor of Indianapolis; Michael Spears, Chief of the Police Department; Frank Anderson, a member of the "Transition Authority" that exercised control over the Police Department during its recent consolidation; Monroe Gray, Jr., another member of the Transition Authority; and Cordelia Burks, Mary Maxwell, and Joseph Smith, Jr., members of the Merit Board for the Metropolitan Law Enforcement Agency.

on the terms of a 1978 consent degree entered into by the Police Department and the DOJ.[4] The consent decree settled litigation alleging that the Police Department had engaged in a pattern of racially discriminatory employment practices that adversely affected African-Americans. The decree was designed to eliminate the discriminatory employment practices and to require the Police Department to take certain affirmative remedial measures to improve the job prospects of African-Americans in the Police Department.[5]

---

[4] In accordance with the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties consented to have a magistrate judge conduct all proceedings in the case.

[5] In 2005 the DOJ filed a motion to dissolve the consent decree on the grounds that it had fulfilled its purpose. In 2008, after the promotions at issue in this case had already been made, the district court approved of a joint motion to dissolve this consent decree.

In separate litigation the DOJ brought suit against the Police Department alleging that the Department had violated Title VII by making promotions on the basis of race and sex, citing in particular (among other examples) the lieutenants who are plaintiffs in this case as instances of reverse discrimination in the Department's promotion decisions. The Police Department entered into another consent decree in which, without admitting any liability, it agreed to retroactively promote all of the alleged victims, including the lieutenants in this case. Instead of pursuing relief through this new consent decree, the lieutenants elected to proceed with this lawsuit.

More specifically, the city officials claimed in their motion that the 1978 consent decree conferred qualified immunity from suit because it effectively mandated the promotion decisions at issue here. The magistrate judge disagreed, concluding that the consent decree did not require—or even permit—the Police Department to make promotions based on race. The judge noted that although the consent decree set recruitment and hiring goals for African-American officers, it specifically stated that "[p]romotions shall be based upon relevant standards and criteria which will be applied without regard to race or color." The judge denied the Rule 12(c) motion in its entirety, and the individual city officials appealed.[6]

## II. Discussion

We have jurisdiction under the collateral-order doctrine to hear this appeal challenging the magistrate judge's denial of the individual city officials' claim of qualified immunity. In *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

---

[6] The City of Indianapolis and the Merit Board also sought judgment on the pleadings based on the terms of the 1978 consent decree. The denial of their motion was not immediately appealable.

District-court orders denying qualified immunity are reviewed de novo. *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). Because this case comes to us following the denial of a Rule 12(c) motion for judgment on the pleadings, we construe the allegations in the complaint in the light most favorable to the plaintiffs, *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009), and ask two questions: (1) Do the facts alleged show that a constitutional right was violated, and (2) was the right in question sufficiently well established that a reasonable officer would have been aware of it? *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). Under *Pearson v. Callahan*, 129 S. Ct. 808, 812 (2009), we need not consider these questions sequentially, but in this case, it makes sense to do so.

In denying the defendants' claim of qualified immunity, the magistrate judge concluded that the lieutenants had adequately alleged a violation of their right to equal protection in their employment, that this right was sufficiently well established in 2006 when the promotions in question took place, and that the 1978 consent decree did not require the City to make promotions based on race. These determinations were sound.

"Race-conscious employment decisions made by the state are presumptively unconstitutional and will satisfy the requirements of equal protection only where they are consistent with strict scrutiny." *Alexander v. City of Milwaukee*, 474 F.3d 437, 444 (7th Cir. 2007); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)

("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989) (holding that the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification). The lieutenants alleged in their complaint that they were passed over for promotion in favor of three black lieutenants despite ranking higher on the Police Department's merit-based "eligibility list" than those who received promotion. A racial classification having been identified, it is the defendants' burden to prove that the classification satisfies strict scrutiny, *Alexander*, 474 F.3d at 444-45, a burden rarely carried at the pleadings stage. The lieutenants' complaint thus sufficiently alleges a constitutional violation. As for the second inquiry, it is well established under *Croson* and *Adarand* that racial classifications undertaken by governmental officials are constitutionally suspect and subject to strict scrutiny. *Id*. at 446-47.

The city officials do not challenge this basic analysis. They argue instead that they are entitled to qualified immunity because their actions were compelled by the 1978 consent decree. They cite the Eighth Circuit case of *Martinez v. City of St. Louis*, 539 F.3d 857 (8th Cir. 2008), for the proposition that employment decisions made in accordance with a court-approved consent decree cannot form the basis of an unlawful discrimination action seeking damages. As a fallback position, they contend that at the very least, as of 2006 it was not

clearly established that a municipal employee might face liability for mere compliance with a consent decree. Both of these arguments are based on a faulty factual premise—namely, that the consent decree required the use of race as a criterion for promotion within the Police Department.

The 1978 consent decree is a comprehensive agreement designed to remedy unlawful racial discrimination and correct underrepresentation and underutilization of African-Americans in the Police Department.[7] It is true that some sections of the 30-page decree permit the Police Department to take race into account when making certain employment decisions. For instance, Section IV, which covers "Recruitment and Hiring," requires the Police Department, at least initially, to ensure that African-Americans constitute at least 25% of all future training classes for incoming officers.[8] This section of the decree also contains general language establishing a "long-range goal" of "increas[ing] the black composition of the Police and Fire Departments so that it more nearly reflects the racial and ethnic composition of the work force of the City of Indianapolis."

Section X, titled "Job Assignments," is designed to eliminate race-based work assignments; it states that "duties, job assignments and transfers given to any indi-

---

[7] The consent decree also applied to the Indianapolis Fire Department.

[8] This requirement was subject to the existence of a sufficiently large pool of African-American applicants.

vidual officer are not to be based solely upon any individual's race or color." Importantly here, the consent decree is quite clear that race shall have no place in the promotions process. Promotions are addressed in Section IX, and that section contains language specifically mandating that "[p]romotions shall be based upon relevant standards and criteria *which will be applied without regard to race or color*." (Emphasis added.)

Faced with this unmistakable directive, the city officials contend that they were more generally required to take appropriate remedial actions—including actions that were directly motivated by racial considerations—in order to effectuate the overall purposes of the consent decree, i.e., to increase the number of African-Americans throughout all levels of the Police Department. They insist that this reading is the only one that "harmonizes" all of the consent decree's key provisions. Their argument hinges on the "Goals" subsection of Section IX of the decree, which states in relevant part:

> As a long-term goal, [the Police Department] agree[s] to adopt and seek[s] to achieve a goal of promoting blacks to the ranks of Sergeant, Lieutenant and Captain within the Police Department . . . so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made, the black percentages of which will begin to increase under the provisions of this Decree relative to the recruitment and hiring of police officers . . . .

The city officials ask us to read this provision in conjunction with an earlier provision which provides that

"[r]emedial actions and practices required by the terms or permitted to effectuate and carry out the purposes of this Decree shall not be deemed discriminatory . . . ." They maintain that these two sections, when read together, required—or at least authorized—the adjustment of the eligibility list on the basis of race in order to guarantee that a "reasonably representative" number of African-Americans were promoted to captain. The trouble with this argument is that it runs headlong into the consent decree's explicit prohibition against using race in making promotion decisions.

The defendants also contend that the consent decree would be rendered internally inconsistent if Section IX's prohibition on using race as a promotion criterion is read as an absolute bar against any race-based decision-making in the promotions context. This argument is unconvincing. We find no inconsistencies in the language of the various provisions; in fact, the framework the decree establishes is quite logical.

Three critical elements of the consent decree work to ensure that African-Americans are promoted to sergeant, lieutenant, and captain at a reasonable rate. First, Section IV requires that the pool of applicants for these various positions (*i.e.*, officers in the Police Department) include a "reasonably representative" number of African-Americans. Second, Section X requires the Police Department to refrain from using race as a factor when handing out job assignments; among other things, this provision assures that African-American officers are not routinely excluded from work assignments

likely to lead to promotion. Finally, the consent decree requires that the "promotional selection device[s]" adopted by the Police Department be racially neutral. More specifically, Section IX(D) mandates that any promotional screening tool "may not be used more than one (1) time if it has an adverse effect on blacks and it is not shown to be properly validated in accordance with applicable federal guidelines."

If the Police Department were permitted to adjust the results of any promotional test, *ex post*, in order to advantage African-American officers, Subsection IX(D) would be of little use because the results of any offending test could simply be manipulated after the fact in order to produce the desired outcome. Properly understood, Subsection IX, read as a whole, operates to prohibit so-called "race-norming" in promotions. Accordingly, we agree with the magistrate judge that the consent decree did not require the use of race as a factor in making promotion decisions. The individual defendants are not entitled to qualified immunity from suit.

AFFIRMED.